**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

-------------------------------------------------------------------x

UNITED STATES OF AMERICA                    Criminal Case No. 21-CR-193-BAH

v.

GREG RUBENACKER,

                                Defendant.

-------------------------------------------------------------------x

**SENTENCING MEMORANDUM OF GREG RUBENACKER**

Michaelangelo Matera
The Matera Law Firm
*Attorneys for Greg Rubenacker*
560 Broadhollow Road, Suite 303
Melville, New York 11747
(516) 741-6700

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---------------------------------------------------------------x

UNITED STATES OF AMERICA            Criminal Case No. 21-CR-193-BAH

v.

GREG RUBENACKER,

Defendant.

---------------------------------------------------------------x

### SENTENCING MEMORANDUM OF GREG RUBENACKER

Comes Now Defendant, Greg Rubenacker ("Rubenacker") by and through his attorneys The Matera Law Firm by Michaelangelo Matera and files this Sentencing Memorandum and respectfully requests a downward variance(s) from the applicable Sentencing Guidelines range, and as required by applicable law, and says as follows:

### BACKGROUND

On January 5, 2021, Rubenacker travelled with a friend to Washington, DC to join in what at the time he thought would be a peaceful protest of the 2020 presidential election results. Mr. Rubenacker had some serious concerns about what was irresponsibly being reported by some members of the media who were reporting that the election was not legitimate and that votes were either being double counted, thrown out, registered after the deadline for voting and/or other similar irregularities. He has since come to learn and accept that this was not the case and as Your Honor will recall, he expressed as much during the plea hearing.

As I am sure Your Honor is well aware, the rhetoric of some in the media as well as many

1

of our elected officials was based on the claim that the 2020 election was stolen and that the Democratic Party had arranged for things like stuffing ballot boxes, double counting votes, throwing out votes that were cast for then President Trump, all intended to alter the outcome of the election. This is not something that amounted to mere rumors and tales concocted by conspiracy theorists as there will always be some of those sorts who the average person knows not to take seriously lest we believe that the moon is made of cheese and that Neil Armstrong never actually landed there. Instead, these claims were being made by our elected officials all the way up to the White House. As an impressionable young man, Rubenacker was caught up in the rhetoric and at the time believed it to be true and if true, felt it was a travesty that our election process could be so easily manipulated. Again, not a conclusion he came to on his own but rather a conclusion based on purported facts and supposed videos put out there by people who should know better. People who we elected because we trusted them to represent us. People who persons such as Mr. Rubenacker believed completely.

On January 6th, Rubenacker proceeded to the Ellipse to hear a speech that was to be given by then President Trump. At no time did Rubenacker anticipate that there would be any violence, nor did he plan on participating in any. Unlike scores of others who were in the crowd that day, Rubenacker carried no weapons, Rubenacker neither carried nor possessed any protective gear, Rubenacker carried no political paraphernalia (though he was given a hat while in the crowd that contained a political slogan). These individuals who appeared with these items, as well as the ones who obtained items while there, had every intention to commit violence before they arrived in Washington that day and were prepared for it and many posted their intentions beforehand on social media. Rubenacker was armed with nothing more than his Essentia water bottle; not the act of a person set out on getting involved in any violent acts.

It is true that Rubenacker filmed the crowd of people yelling and chanting during former President Trump's speech and posted a message which stated, "America is pissed." However, that

message is about what he observed and as the video shows, many in the crowd were just that. The fact that their anger was not justified and was fueled by false reporting and false statements from our own elected officials does not make what he observed to be going on any less true. Rubenacker admits that he himself got caught up in beliefs regarding the election being stolen and was himself upset. But the truth is that if what was being reported was in fact true, what American would not be upset and angry? Rubenacker has expressed to Your Honor that he understands the truth now and wishes that he never got caught up believing the false reports and thus wishes that he had never even gone to Washington that day. Unfortunately, the truth is that he did and he profusely apologizes for being duped into believing what he was hearing and even more so, for his actions the rest of that day.

Rubenacker followed the thousands of people who started to head towards the Capitol after hearing the former President's remarks but even at that point in time, he had no idea what would transpire next. At approximately 2:13 p.m., Rubenacker entered the Capitol through the Senate Wing Door on the west side of the building and while inside he did record additional videos which contained what he was observing at the moment of filming. After entering the building, Rubenacker followed other members of the crowd, none of whom he knew as his friend that he travelled to Washington with was not feeling well and stayed at the hotel. As can be heard in the video of this moment, other people in the crow who again he did not know were yelling, "where are they counting the votes". With everything that was going on along with the noise, Rubenacker does not recall even hearing the exact words but knew people were yelling things and now, having listened to the recordings, he knows that is what was said but again, did not at the time.

The crowd approached and followed a Capitol Police Officer up several flights of stairs and into the Ohio Clock Corridor where Rubenacker and others shouted at the officers. However,

there is no video or audio that shows Rubenacker shouting any threats of violence or intention to otherwise hurt anyone, rather he was yelling about his misplaced frustration and why the officers were not standing up for Americans, again fueled by his mistaken belief in what he had been hearing in parts of the media and that they officers were actually in a position to do something about it. Soon thereafter Rubenacker returned to the first floor and exited the Capitol remaining inside for a total of approximately eight minutes.

At some point thereafter, Rubenacker reentered the Capitol building through the Rotunda Doors on the east side and then entered the Rotunda. While in the Rotunda, Rubenacker smoked marijuana and filmed himself doing so. This was not marijuana that he brought himself with the intention of smoking inside the Capitol but instead was given to him by one of the other individuals inside the Rotunda whom he did not know. This individual has admitted as much on a recent documentary regarding the events of January 6th. Sometime later, members of the United States Capitol Police and Metropolitan Police Department entered the Rotunda while Rubenacker was still inside. Rubenacker admittedly yelled some comments at the officers but again, none of the comments were about violence and at no time is Rubenacker heard threatening violence towards anyone.

Later, Rubenacker regrettably swung the aforementioned plastic Essentia water bottle in the direction of an officer. A few moments later, officers dispersed pepper spray in the direction of the crowd and at that point, Rubenacker, who had opened his bottle to drink some water, reacted by jerking the bottle in a way that he splashed some water from it towards the officers. Rubenacker next, walked out of the Rotunda where an officer directed him towards the exit where he left the Capitol.

Rubenacker knows and regrets the fact that although it was not his intention at the time, his actions were wrong and played a role in the events that transpired that day. As will be set forth more fully herein, these acts are completely out of character for Rubenacker who has no other criminal history whatsoever.

Rubenacker's remorse is sincere. He has done everything that he can since January 6th to show how disappointed he is in himself and to try to help in any way that has been asked of him. This includes but is not limited to Rubenacker voluntarily appearing before the House Select Committee and providing testimony about his involvement in the events of January 6th and what he observed that day. He has also remained at his home caring for his elderly parents who have written to Your Honor how much they rely on him and need him home. Rubenacker has also engaged with mental health counselors and come a very long way from the mental issues that he has endured ever since watching several of his friends perish in a car accident while he was in high school. A glowing letter from the counselor is also annexed hereto to give Your Honor a better insight into the person that Greg truly is, apart from just the person who entered the Capitol on January 6th, fueled with the feeling of sadness and disappointment in the Country that he loves so much after believing what some were reporting.

From the inception of the case, Rubenacker has always expressed his remorse for his involvement in the events of January 6th and has always expressed a desire to resolve the case and put these unfortunate events behind him. Unfortunately, the plea offer being made by the Government required that he plead guilty to the top two counts in exchange for dismissing only lower-level counts and as part of the plea agreement, he would have to waive his right to dispute the offense level calculations determined by the Government and waive his right to appeal. Rubenacker wasn't worried about his right to appeal but we strongly believe, as will be set forth more fully herein, that the Government's calculations are wrong. Still determined to take responsibility for his actions and not cost the taxpayers additional monies on his account, Rubenacker decided to plead guilty to the entire indictment, thereby preserving his right to dispute the Government's calculations. On February 11, 2022, Rubenacker did just that and pled guilty to the entire indictment before Your Honor.

As noted in the PSR, Mr. Rubenacker has no prior record. (PSR Dkt#53 ¶61-63) This case

represents the first time Mr. Rubenacker has ever been in a criminal courtroom. He is an aspiring musician trying to find his way in the world. Law-abiding, hard-working, honest, caring, thoughtful, generous and the kind of person you would love to have for a son or friend. This is a story about how this man, for approximately forty-eight minutes of one day lost his way, getting caught up in something much bigger than himself. The story of an impressionable young man who listened to reports claiming that the Country he loves so much was in trouble due to an alleged corrupt election process. The story of a man who was determined to head to Washington to peacefully protest against what he now knows was a mistaken belief based on false reporting and false statements from our elected officials.

A man who followed a crowd of people into the Capitol and up some staircases, at the moment, more out of curiosity than anything else. The next forty plus minutes have turned out to be the most regrettable of his young life. Rubenacker admittedly got caught up in the mob mentality that was all around him as people were screaming and yelling and although he did not hear their exact words, it caused him to voice some of his own opinions towards officers who he was deluded to believe could do something about the election, asking them things like who they were serving and asking why they weren't protecting the people. Again, at no time is it claimed nor was it the case that Rubenacker himself made any threats towards the officers or any of our elected officials. Yes, he was yelling and was upset about his mistaken beliefs but being angry and upset is a natural feeling for one who was so indoctrinated with the belief that something as special as our election system was corrupted.

The story of a man who entered the Rotunda and was immediately so impressed with the temple of democracy that he was standing in and began to take pictures of the room and the statuary. He observed many individuals smoking and when he was approached by another individual who offered him a marijuana cigarette, he accepted. A man who then saw officers enter

the Rotunda along with some of the tussling between some of the officers and some of the civilians. A man who had no weapons and reacted to what he observed going on all around him and regrettably swung his water bottle and then splashed some water out of the bottle in the direction of the officers. It was never his intention to hurt anyone, nor could he with a plastic Essentia water bottle, but he knows that such does not excuse his actions. Lastly, it is the story of a man who deeply regrets his actions and who is worthy of this Court's mercy.

At all times throughout this case, Mr. Rubenacker has cooperated with law enforcement, and with every request of the Department of Justice. It should also be noted by the Court that Mr. Rubenacker, as already mentioned, has cooperated with the United States by willingly and voluntarily complying with a request of the House Select Committee, testifying before them for several hours. Mr. Rubenacker understands what he has done and offers no excuse for his actions other than to say he got caught up in the situation all around him and he deeply regrets his actions. Rubenacker has accepted responsibility for his actions. (PSR Dkt#53 ¶59) (*"The defendant has assisted authorities in the investigation or prosecution of the defendant's own misconduct by timely notifying authorities of the intention to enter a plea of guilty"*)

Rubenacker decided to enter a guilty plea with no assistance or plea bargain with the Government and in pleading to the entire indictment, showed the strength of his character when so many others are still deciding whether to push their cases to trial despite the clear evidence of their guilt. Rubenacker hopes that this shows the Court who he really is, separate and apart from the person seen on the surveillance videos committing the acts he did. Rubenacker is a young man just starting out in life, who admittedly made a major mistake on January 6th. We respectfully submit that the fact that he was willing to enter a guilty plea when so many others have not warrants extra consideration in a case as unique as this one. To that end, I am honored to write on his behalf, and hope that this sentencing memorandum provides this Honorable Court some insight into what a fine

man will stand before her.

## A. Rubenacker's Personal Background

Born on February 5, 1996, Greg was adopted by the Rubenacker family while still an infant. Unfortunately, he never knew his birth parents. One of sixteen children, Greg was raised by his parents Peter (86 years old) and Marguerite (80 years old) in Farmingdale, New York. Growing up in such a large family was not easy for Greg who often found himself wanting to be alone and was not very sociable. He often felt forgotten.

Tragically, when Greg was 18 years old, he was present to see five of his high school friends die in an automobile accident. The accident occurred when the car that he was a passenger in began to race with the car carrying the five friends. Unaware of what was going on at the moment that the drivers of the two cars apparently had a meeting of the minds to race, Greg repeatedly yelled at the driver of his vehicle to stop but unfortunately, he did not do so until it was too late. Greg had and continues to have a very hard time coping with not only what he saw, but also with the loss of his friends. Again, Greg was not overly social so the friends that he had were everything to him.

He underwent counseling almost immediately to help him to cope with his bouts with depression over the incident. It was for these reasons that he turned to music which provides him with an escape. Greg was also diagnosed with Attention Deficit Disorder and Hyperactivity Disorder. He continued to seek treatment for these issues as well as depression and since 2020 has been treating with Dr. Conan Tu who diagnosed him with Post Traumatic Stress Disorder and anxiety.

During the course of his supervised release, Greg was required to see an additional therapist and was assigned to Kayla Moffitt of First Light Physical Services. Counsel has spoken with Ms. Moffitt numerous times and she has indicated that Mr. Rubenacker has complied with all of her directives and attends sessions without fail. Greg has indicated that speaking with her has really

helped him and feels hat he is better for his time with her. Annexed hereto as Exhibit B is a copy of the report of Ms. Moffitt.

Currently, Greg cares for his elderly parents while simultaneously focusing on his musical career. He regularly attends recording sessions and works with a vocal coach who has repeatedly expressed his belief that Greg is on his way to big things in the music industry. Greg's parents continue to rely on him even more so in their later years as indicated in their letter annexed hereto at Exhibit A. Marguerite suffers from a heart condition which has resulted in hospital stays which at the time saw Greg running back and forth between the hospital and home to care for his dad.

## DEFENDANT GREG RUBENACKER'S ARGUMENTS AGAINST CERTAIN SPECIFIC OFFENSE CHARACTERISTIC ENHANCEMENTS

A review of the Presentence Investigation Report reveals that probation has indicated an adjusted offense level of 25. In coming to that determination, they have included enhancements under USSG §§2J1.2(b)(1)(B), 2J1.2(b)(2) and 3A1.2(a). However, the Government and the Defendant are in agreement that an enhancement under §3A1.2(a) is not applicable as the alleged victim was not an individual government officer or employee but instead was Congress. Such being the case, although Defendant does not entirely agree with the ultimate offense level reached by the Government, we are in agreement that even in the worst-case scenario, the proper adjusted offense level would be 22 instead of 25 as indicated by probation.

We next turn to the other enhancements under USSG §§2J1.2(b)(1)(B) and 2J1.2(b)(2) for a total enhancement of eleven levels. The Government has previously stated their position that these enhancements are applicable to the count of Obstruction of an Official Proceeding under 18 USC §1512(c)(2). Probation, as per the PSR, agrees. Defendant respectfully submits that these enhancements are not applicable as at no time did the Defendant cause or threaten physical injury to

any person and just as important, the event in issue does not involve the administration of justice as it was not related to a judicial or grand jury proceeding.

To fully understand the issue presented herein, we respectfully point out that the two counts that are the most relevant in determining the appropriate offense level in the instant matter are 18 USC §1512(c)(2) and 18 USC §111(a)(1) as they have the highest offense levels. Again, the PSR suggests that the adjusted offense level in connection with 18 USC §1512(c)(2) is 25. The Government and Defendant are in agreement that this calculation is incorrect and that the 3-level victim related adjustment is not applicable to the instant matter where the victim is not a person. However, it is also the position of the Defendant that the enhancements under USSG §§2J1.2(b)(1)(B) and 2J1.2(b)(2) are not applicable and that as a result, the proper offense level in connection with 18 USC §1512(c)(2) should be 11 and that 18 USC §111(a)(1), with an adjusted offense level of 17, would have the higher offense level.

USSG §2J1.2 sets a base offense level for obstruction of justice at 14. The section further reads in pertinent part as follows:

(b) Specific Offense Characteristics

(1) (Apply the greatest):

(B) If the offense involved causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice, increase by 8 levels.

(2) If the offense resulted in substantial interference with the administration of justice, increase by 3 levels.

From this, it is clear that in order for the 8-level enhancement to apply, the Defendant must have caused or threatened to cause physical injury to another in order to obstruct the administration of justice and for the 3-level enhancement to apply, not only must the offense result in substantial interference but also again requires that such interference be with the administration of justice. The

offenses that the Defendant has pled to do not involve the administration of justice as again, they have no connection to a judicial or grand jury proceeding which, as will be set forth more fully herein, is required.[1]

Further, the basis for the charge of Obstruction of an Official Proceeding under 18 USC §§1512(c)(2) is the actions of the Defendant in following an officer up the staircases along with other actions of the Defendant during that time period, prior to his leaving the Capitol the first time. The PSR attempts to assess an 8-level enhancement because he, "… swung a plastic bottle at an officer and sprayed water from his bottle across multiple law enforcement officers engaging with other individuals . . . " (PSR Dkt#53 ¶51) However, the act of swinging the plastic water bottle did not take place at this time and we submit that although relevant to count three of 18 USC §111(a)(1), it is not relevant to count two. Again, at no time during the first entry into the Capitol did the Defendant cause or threaten physical injury to any person. It is true that the Defendant found himself in a group of protestors who followed an officer up several staircases, an act which he deeply regrets. The video speaks for itself. In it, the Defendant can be seen walking up the staircases but at no time while on those staircases does the defendant yell anything at anyone, let alone threaten to cause physical injury to anyone. Nor for that matter is anyone suggesting that he actually caused physical injury to anyone. Defendant did point and yell at officers but at no time did he make any threats to cause physical injury, instead voicing his admittedly misplaced and mistaken perception that the officers were not standing with those who were upset over the election results which they believed at the time to have been corrupted.

---

[1] During a prior court proceeding, Defendant indicated his intent to dispute the 8-level enhancement and left out the 3-level enhancement as the elimination of the 8-point enhancement would have resulted in an adjusted offense level of 14 and as such would be below the adjusted offense level of 17 under 18 USC §111(a)(2). However, Defendant submits that, for the reasons set forth herein, since the events do not involve the administration of justice, the 3-level enhancement would not apply as well.

Nor for that matter does the Government seem to be of the opinion that the assault that occurred during the Defendant's second entry into the Capitol is related to count two. The indisputable fact is that a number of other defendants who are accused of assault were offered to not have to enter a plea to 18 USC §1512(c)(2). This will be discussed in more detail herein. Regardless, it is clear that the offense had nothing whatsoever to do with the administration of justice, a requirement for §§2J1.2(b)(1)(B) and 2J1.2(b)(2) to apply.

18 U.S.C. §1512(c) deals with the obstruction of an "official proceeding." A review of the history of the charge reveals that the provision was added to the statute in 2002 as part of the Sarbanes-Oxley Act. In 1995, the Supreme Court in *United States v. Aguilar*, 515 U.S. 593 construed obstruction of the "due administration of justice" in 18 U.S.C. §1503 to require a showing that a defendant's actions must have the "natural and probable effect" of interfering with the due administration of justice. (Aguilar at 599 *citing United States v.* Wood, 6 F.3d 692, 695) The Court went on to state that, "The action taken by the accused must be with the intent to influence judicial or grand jury proceedings." (*Aguilar* at 599)

Similarly, courts have held that to convict a defendant under §1503, the government must establish, "(1) that there is a pending judicial or grand jury proceeding constituting the administration of justice, (2) that the defendant knew or had notice of the proceeding, and (3) that the defendant acted with the wrongful intent or improper purpose to influence the judicial or grand jury proceeding . . . that is, that the defendant corruptly intended to impede the administration of that judicial proceeding." (*United States v. Sampson*, 898 F.3d 287, 299, quoting *United States v. Schwarz*, 283 F.3d 76, 109) It cannot be the case that the phrase "administration of justice" was intended to mean one thing in the criminal statutes such as §1503 and something completely different in the Guidelines without a clear indication that such was intended to be the case. No such indication exists.

We submit that it follows that "administration of justice" as used in §§2J1.2(b)(1)(B) and 2J1.2(b)(2) must involve a connection with a judicial or grand jury proceeding. Again, no such connection exists in the instant matter. In the Application Notes, it states, "Substantial interference with the administration of justice" includes a premature or improper termination of a felony investigation; an indictment, verdict, or any judicial determination based upon perjury, false testimony, or other false evidence; or the unnecessary expenditure of substantial governmental or court resources. This definition pre-dates the 2002 amendment of §1512 which added an "official proceeding" to its scope. 18 U.S.C. §1515(a)(1) expressly defines an "official proceeding" for purposes of §§1512 and 1513 to include judicial and legislative proceedings. As such, it is clear that the term "official proceeding" is a far broader term than "administration of justice." But the enhancements in §2J1.2 require an obstruction of or interference with "the administration of justice" in order to apply, not an "official proceeding."

The enhancements in §2J1.2 originated before the "official proceeding" provision was added to §1512 in 2002, and no changes were made to the enhancements in 2002. The enhancements continued to only apply to interference with the "administration of justice." §2J1.2 was amended twice in 2003 in response to the Sarbanes-Oxley Act but neither amendment addressed the issue presented here. Amendments 647 and 653 changed §2J1.2 by increasing the base offense level and adding another enhancement that deals with document destruction. There is no claim here involving document destruction. They also added an upward departure provision concerning some obstructive conduct. As such, it is clear that the two enhancements in §2J1.2 were never amended to encompass the broader concept of an "official proceeding" enacted in §1512(c) by the Sarbanes-Oxley Act. As obstruction of an "official proceeding" rather than the "administration of justice" is the theory of prosecution in this and the other January 6 cases, the enhancements do not apply.

Every circuit that has addressed issues involving the "administration of justice" has defined

13

the term to apply to a judicial proceeding. In *United States v. Richardson*, 676 F.3d 491, the court made this abundantly clear, stating, "We have defined "due administration of justice" as "the performance of acts required by law in the discharge of duties such as appearing as a witness and giving truthful testimony when subpoenaed." *Williams,* 874 F.2d at 977 n. 24 (internal quotation marks omitted); *Griffin,* 589 F.2d at 203 n. 4; *Howard,* 569 F.2d at 1334 n. 4. Thus, obstructing **the due administration of justice means "interfering with the procedure of a judicial hearing or trial**." [emphasis added] *Howard,* 569 F.2d at 1337 n. 9." (*Richardson* at 502-503)

Other circuits have followed suit. In *United States v. Brenson*, 104 F.3d 1267, the 11th Circuit stated that, "…due administration of justice" means "judicial procedure" and "the performance of acts required by law in the discharge of duties such as appearing as a witness and giving thoughtful testimony when subpoenaed." (*Brenson* at 1279-80) In *United States v. Warlick*, 742 F.2d 113, the 4th Circuit defined obstruction of the administration of justice as acts that "thwart the judicial process." (*Warlick* at 114) In *United States v. Rasheed*, 663 F.2d 843, the 9th Circuit stated that the administration of justice commences with "a specific judicial proceeding." (*Rasheed* at 851)

Even in this very Courthouse, it has been held that Congress does not engage in the administration of justice. In the case of *United States v. Montgomery*, 21-cr-46, Judge Moss said as much. In deciding a motion before him regarding the viability of the count of 18 USC §1512(c)(2) and whether the proceedings on January 6th constituted an "official proceeding", Judge Moss stated, "Most notable, with two narrow exceptions discussed below, Congress does not engage in adjudicative proceedings (or even quasi-adjudicative proceedings) or in the "administration of justice." (*Id.* at 14, *citing Trump v. Mazars*, 140 S.Ct 2019, 2032) Judge Moss makes clear that a proceeding before Congress, such as in the instant matter, is a "congressional proceeding" and a proceeding before a Federal Government agency, which is absent in the instant matter, refers to an "administrative proceeding." (*Id.* at 15) As such, it is clear that even this district recognizes the

distinction between an "official proceeding" and the "administration of justice" and does not consider the proceedings before Congress on January 6th to be one involving the administration of justice.

Courts have been willing to stretch the circumstances under which a claim could be made that a situation involves the administration of justice. However, even in those cases, the conduct ultimately has to relate to a judicial or grand jury proceeding. In *United States v. Calvert*, 511 F.3d 1237 for example, the court applied the enhancement despite the fact that no judicial proceeding was pending at the time that the defendant arranged for retaliation against a witness in a prior prosecution. The court determined that the actions interfered with the administration of justice as witnesses are a viable part of the judicial process and the acts would cause fear on the part of witnesses to come forward. However, even with no judicial proceeding pending at the time of the act, the court was clear that the act was nevertheless related to a judicial proceeding. Once again, there is no such connection in the instant matter.

Again, in the instant matter, there is no connection to a judicial or grand jury proceeding and as such we respectfully submit that the enhancements are not applicable. Without the enhancements, the proper adjusted offense level in connection with 18 USC §1512(c)(2) is 11. It follows that the proper offense level should be 17 as a result of 18 USC §111(a)(1).

It is Defendant's position that the issue presented as to whether the enhancements under USSG §§2J1.2(b)(1)(B) and 2J1.2(b)(2) and more specifically, whether the events of January 6th could be deemed as having to do with the administration of justice is a question of law properly determined by the Court as the relevant facts themselves are not in dispute. However, in the event that this Court should decide that there are factual disputes that the Court needs to resolve before making a decision, the Defendant requests that the Court hold an evidentiary hearing to make the determination of whether the enhancements apply or not. (*United States v. Fatico*, 579 F.2d 707)

The Defendant reserves the right to request an opportunity to respond to the Government's submission as to this issue should such be necessary.

<u>**SENTENCING FACTORS**</u>

As a result of the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220, sentencing courts are no longer constrained solely by the federal sentencing guidelines and must now consider each of the factors enumerated in 18 USC §3553(a) to fashion an appropriate sentence. An appropriate sentence is one that is, "sufficient, but not greater than necessary" to comply with the purposes set forth in 18 USC §3553(a)(2). (*Kimbrough v. United States*, 552 U.S. 85, 101) The advisory sentencing guideline range is but one of many relevant factors in the sentencing court's determination of an appropriate sentence. (18 USC §3553(a))

In *United States v. Booker*, 125 S. Ct. 738, 756, the Supreme Court, reaffirming its holding in *Apprendi v. New Jersey*, 530 U.S. 466, concluded that the provisions of the Federal Sentencing Reform Act of 1984 were not to be applied as though they were mandatory, essentially making the guidelines advisory. (*Id.* at 757) Therefore, instead of being bound by the Sentencing Guidelines, the Sentencing Reform Act, as being revised by *Booker,* requires a sentencing court to consider Guidelines ranges but it permits the court to tailor the sentence and consider other statutory concerns, as well.

Therefore, under *Booker*, sentencing Courts must treat the sentencing guidelines as just one of a number of sentencing factors that are otherwise set forth in 18 USC §3553(a). The primary directive in §3553(a) is for sentencing courts to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph 2 of the section. §3553(a)(2) states that such purposes are:

(A)   To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B)   To afford adequate deterrence to criminal conduct;
(C)   To protect the public from further crimes of the defendant; and

16

(D)   To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

## A.  Relevant Sentencing Factors Under 18 USC §3553

In determining the minimally sufficient sentence, §3553(a) further directs sentencing courts to consider the following factors, inter alia:

(1)  the nature and circumstances of the offense and the history and characteristics of the defendant;

(2)  the need for the sentence imposed – (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3)  the kinds of sentences available;

. . .

(6)  the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7)  the need to provide restitution to any victims of the offense.

## B.  The Nature and Circumstances of the Offense

In the cases concerning the events of January 6, 2021, the Government has taken the position that not all actors are equal in terms of culpability. The Government, in their sentencing memos have set forth factors for the courts to consider when determining their sentences. Some of the factors include: (1) whether, when, and how the defendant entered the Capitol building; (2) whether the defendant engaged in any violence or incited violence; (3) whether the defendant engaged in any acts of destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and where the defendant

traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored, law enforcement; and (9) whether the defendant otherwise exhibited evidence of remorse or contrition. We respectfully submit that the Court should also consider (10) whether the Defendant travelled to Washington prepared for violence or with the intent to commit a violent act; (11) whether the Defendant was involved in the planning of the events that unfolded; and (12) whether the Defendant timely took responsibility for his actions and offered to plead guilty thereby avoiding the need for the use of prosecutorial and court resources.

Mr. Rubenacker did enter the Capitol at two separate times. During the first entry, he approached an entrance where it was observed that there were officers who were holding the door open. Foolishly, he decided to enter. Several minutes later he left the building before seeing more people entering a different entrance and he did follow them in ultimately ending up in the Rotunda. At no time during his entry is he seen to be forcing his way in or pushing through any member of law enforcement. As such, this factor weighs in favor of the Defendant as although we agree that he should not have entered the building in the first place, he did not engage in nor did he take part in any violence during those entries.

Defendant has admitted to his actions once inside the Capitol and more specifically that he did at a later moment commit an act of violence by swinging his plastic Essentia water bottle in the direction of an officer and thereafter, splashing officers with water from his bottle. However, although we are not attempting to in any way minimize or justify his actions, he did not possess or use any weapons that were capable of causing harm to anyone as so many others did. Also, unlike so many others, at no time did Mr. Rubenacker destroy or remove any property from the building. Nor is he alleged to have done so. Similarly, there is no allegation that Mr. Rubenacker encouraged others to remove or destroy any property. Additionally, at no time after the events of January 6th did the Defendant ever destroy any evidence. In fact, various videos and pictures were recovered from

18

his phone and computer where they were stored since the moment they were taken.

While inside the Capitol, the Defendant did travel up several staircases and into the Ohio Clock Corridor before leaving the building eight minutes later. Rubenacker admittedly re-entered the building and entered the Rotunda where he remained for approximately thirty-eight minutes. At no time did he enter either of the chambers nor did he enter any of the offices of the members of Congress.

Since the time shortly after his arrest, Rubenacker took the time to reflect on his actions and immediately showed remorse and indicated to counsel a willingness to accept responsibility for his actions. Counsel thereafter had numerous conversations with the Government about the possibility of resolving the case. These discussions took several months as the parties could not agree on the stipulation being required by the Government, namely that the Defendant waive his right to dispute their determination of the appropriate offense level. As we did not agree with their assessment, for the reasons set forth herein, we could not do so. However, that did not deter Rubenacker who then decided to plead guilty to the entire indictment and avoid the need for a trial. We respectfully submit that it took great courage to plea to the entire indictment while so many have refused to even accept a plea bargain and are insisting on bringing their cases to trial. Although it was his right to go to trial, Rubenacker waived that right instead opting for a speedy resolution of the matter.

We submit that his willingness to accept a plea early on is especially significant in a case as unique as the ones related to January 6th. At the time of this writing, it is my understanding that there are still approximately 600 open cases related to January 6th. It would have been easy for Rubenacker to sit firm with these 600 defendants and see how things play out. But instead, he was insistent on doing what he knew was right and plead guilty. This warrants a significant downward departure here as it serves a message to the other 600 people still deciding what to do that if they are guilty, waiting to enter a plea will not help their situation. To give a harsh sentence in the instant matter may serve

as a deterrent for anyone still on the fence deciding whether to go to trial or not while leniency will undoubtedly serve as an incentive for many to follow Rubenacker's example and take responsibility for their own actions.

His remorse was evident during the plea hearing. Your Honor will recall that at one point he placed his head down causing Your Honor to inquire as to what he was doing. His response was that he was just so upset and disappointed with himself for ever getting involved in the situation. Certainly, these are not the words or actions of one who is without a great deal of remorse. So many others have continued to show their defiance and contempt for the government and the courts of the district. Defendants have given interviews in which they express no regret, one person even stating that if she had it to do all over again, she wouldn't change her actions at all. One defendant made a mockery of the court as he arrived for his trial with a substantial amount of theatrics including a truck and trailer decorated with flags. Rubenacker has not and would not do any of that. I assure you that his remorse is genuine.

In looking at the factors that we would like Your Honor to also consider, we remind the Court that while so many others arrived in Washington that day armed for battle with goggles, helmets, riot gear, knives, pepper and bear spray and even a stick taped to a confederate flag that was ultimately used to assault an officer. Rubenacker arrived only with a plastic bottle of Essentia water. He never intended to be involved in any violence and admits that he foolishly got caught up in the moment and his surroundings and acted badly. But never was that his intention and he has repeatedly stated to me that if he could do it all over again, he would not have even come to Washington on January 6th.

Lastly, as already mentioned, Mr. Rubenacker did make a timely indication of his desire to resolve the matter and take responsibility for his actions. Although the case was approximately a year old at the time of the plea, that was mostly due to the ongoing pandemic and the previously

mentioned disagreement between counsel and the Government, not over whether to plead guilty or not but instead over an offense level calculation. By entering his guilty plea, Rubenacker has saved the taxpayers the costs of excessive litigation and conserved a substantial number of judicial resources during a time where the COVID 19 pandemic has placed great stress upon the system along with the sheer number of matters still pending from January 6th.

Rubenacker has at all times made himself available to the Government should there be any questions and as previously stated, voluntarily testified before members of the House Select Committee. The Government has elsewhere, in another January 6, 2021 case, acknowledged that this is entitled to "significant weight."[2]

## C.  The History and Characteristics of the Defendant

As set forth in the PSR, Mr. Rubenacker has no criminal history whatsoever. (PSR Dkt#53 ¶61-63) Such being the case, his criminal history category is I. Mr. Rubenacker is an aspiring musical artist. He spends many hours in recording studios with his vocal coach recording music. Your Honor may recall that you had previously granted a motion to amend the conditions of his release to allow him to travel to the studio. Any time away from the recording sessions could have a major impact on the career path he is on as musical artists tend to have a limited shelf life. This factor supports a more lenient sentence.

Mr. Rubenacker also cares for his elderly parents. As one of sixteen children in the family, though many have moved out of the home, the responsibility has fallen to him to be the one responsible for this care. His mother suffers from many health issues and has unfortunately had a number of stays in the hospital. As a result, Greg not only had to previously run back and forth to

---

[2] *United States v. Bustle*, 1:21-cr-238, Government Sentencing Memoranda, at p. 6.

the hospital but also had to come home and care for his father in the absence of his mother.

Mr. Rubenacker has also been on supervised release for over a year now. At no time has he had any issue whatsoever with probation. During that time, he has had an ankle monitor and has essentially been confined to his home other than attorney visits and the allowances the Court gave him. I have personally spoken several times to the officer who Mr. Rubenacker reported to in the Eastern District of New York and was repeatedly told that he has had no issues.

Being filed herewith are several character letters regarding Mr. Rubenacker. All of these letters give an insight to the person that he truly is and that is a person that is very different from the one that the charges against him would suggest. They include letters from Mr. Rubenacker's parents as well as his brother, a celebrated military veteran. There is also a letter from Mr. Rubenacker himself which I urge Your Honor to pay specific attention to as it explains his remorse more than any sentencing memorandum could.

### D. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The events of January 6, 2021 were both serious and tragic. And yet, as reflected above, not every actor that day has equal culpability. Is it appropriate to treat one who entered and ultimately swung a plastic water bottle at an officer, though admittedly very wrong, the same as those who entered and stole or damaged property, those who organized and incited others to act, those who went into sensitive or private areas, or even worse, those who brought weapons to the Capitol that day and then used them on law enforcement officers, regardless of where on Capitol grounds the individuals actually were, such as a lacrosse stick taped to a confederate flag used to strike an officer in the chest or pepper spray used to spray onto a group of law enforcement officers? We do not dispute the fact that the events that unfolded on January 6th were extremely serious, but each person should be judged by their own

individual circumstances and actions and as will be set forth more fully herein, the Government has chosen to make favorable plea offers to individuals whose actions are by their own admission more egregious than those of Mr. Rubenacker. Again, this is in no way meant to minimize Greg's actions, but instead is meant to point out some of the disparities in the Government's treatment of these cases.

Greg has the utmost respect for the law, even though his actions on January 6th seem to suggest otherwise. His very frustration that day that led to his shouting towards the officers was not due to a lack of respect but instead he was questioning them as to why they were not doing more to insure the safeguards of a valid election. He understands now that his belief at the time that the election was stolen was wrong as was his belief that there was something that the officers, even if true, could have done about it. We have had many discussions regarding the judicial system and the fact that if there was something wrong with the election, the proper way to handle it was through the courts. He definitely understands that now and is a better person for it. He has witnessed how the arguments played out in the court system and that what he was led to believe at the time simply wasn't true.

## E.  Adequate Deterrence

18 USC §3552(a)(2)(B) and (C) states that deterrence encompasses the need to deter crime generally as well as the need to protect the public from further crimes by this specific defendant. In the instant matter, Rubenacker made a horrible mistake, not only by acting the way that he did, but by even going to Washington that day. As previously stated, he has absolutely no criminal history and has otherwise lived a law-abiding life until that moment. He never imagined that he would be in the position that he is and certainly does not see any chance of ever being involved in any criminal situation ever again.

As a result of his actions, he has suffered substantial damage to his reputation and has had to

endure tremendous ridicule on social media. Many of his friends and his own family had stopped speaking with him. He has lost some of the contacts that he had in the music industry who will no longer work with him and have stalled his hopeful rise in the industry. These personal consequences that he has suffered are more than sufficient to discourage future similar conduct and make Rubenacker an extremely unlikely recidivist.

As for the need to deter crime generally, we respectfully submit that the immense attention that this case has brought to the Country as well as the public reporting of every case each time it appears on a courts calendar serves as a major deterrent. In fact, several courts have held that a prosecution itself serves as general deterrence. (*See, United States v. Gamarra*, 940 F.3d 1315, 1321) In the instant matter, Rubenacker's entire plea hearing was reported on extensively on social media. This has led to even further ridicule, anonymous threats towards Mr. Rubenacker as well as intense rhetoric with some calling him a terrorist. There is no person that would ever see what Greg is going through as a result of his own actions and not be deterred from committing a similar crime.

This case is also a very unique situation. Although deep division exists in our Country, the vast majority of the public I am sure would agree that what happened on January 6th was wrong regardless of one's beliefs. Such being the case, it is incredibly hard to imagine anyone who watched the events of that infamous day and the fallout from it would not be deterred from committing similar acts. Unfortunately, there will always be those who will choose to continue to believe the lies that were told before that day and for those individuals, there can sadly never be enough deterrent as no act, prosecution or sentence will have any impact on them whatsoever. But I implore Your Honor to not consider these individuals in determine Greg's sentence as again, no sentence will have any impact on these persons whatsoever.

**F.  The Need to Avoid Unwarranted Disparities**

A Court must consider the need to avoid unwarranted disparities among defendants with similar criminal histories convicted of similar criminal conduct. (18 USC §3553(a)(6))  The court should avoid unwarranted similarities in sentencing among defendants who are different in ways not accounted for in the guideline range. (*See, Gall v. United States,* 552 U.S. 38) We respectfully submit that the Court should also take into account unwarranted disparities in the plea offers that the Government has been making to defendants charged with the crimes as Rubenacker since the date of his plea hearing.

As this Court is aware, Mr. Rubenacker took a plea to the entire indictment after plea negotiations failed with the Government.  The failure was based on the fact that the Government's offer was to dismiss the lesser counts in exchange for Rubenacker pleading guilty to the top two counts, one of which is Obstruction of an Official Proceeding under 18 USC §1512(c)(2). As part of the plea agreement, Rubenacker would be required to waive his right to dispute the enhancements and offense level as determined by the Government. As we did not agree with the Government's position for the reasons set forth herein, an agreement could not be reached.

But the fact is that while Rubenacker's actions were regrettable and inexcusable, other individuals who have pled since Rubenacker's plea hearing and who's actions were more egregious than Rubenacker's were allowed to enter pleas that saw the Government dropping the 18 USC §1512(c)(2), something they refused to do for Rubenacker, the result of which leaves these individuals with a lesser offense level than Rubenacker and potentially a lesser punishment. This again is not meant in any way to excuse or minimize Rubenacker's conduct but instead is meant to show the disparity between the sentence Rubenacker potentially faces and the one that individuals who committed more egregious acts face.

In the case of *United States v. Blair*, 21-cr-00186, the defendant was charged with multiple counts including 18 USC §1512(c)(2) and 111(a)(1) after he supposedly brought a lacrosse stick

attached to a Confederate battle flag and used it to strike an officer in the chest while yelling, "What's up motherfucker, what's up, what's up bitch?" After being taken down, he was also found to have brought a knife to the Capitol. Nevertheless, the defendant was permitted to plead guilty to one count of Interfering with a Law Enforcement Officer During a Civil Disorder pursuant to 18 USC §231(a)(3). The agreed upon offense level is 11.

In the case of *United States v. Mattice and Mault*, 21-cr-00657, the defendants were charged with multiple counts including 18 USC §1512(c)(2) and 111(a)(1) after they supposedly arrived at the Capitol in full protective gear and ultimately obtained a cannister which contained chemical spray which they sprayed on two separate occasions on law enforcement officers. Nevertheless, both were permitted to plead guilty to one count of 18 USC §111(a)(1) with the count under 18 USC §1512(c)(2) being dismissed. The agreed upon offense level is 21.

All of these defendants made physical contact with law enforcement officers and while it is unclear if the officers were hurt, it is certainly the case that spraying a chemical agent on officers and striking an officer in the chest with a stick are more egregious than swinging a half-filled plastic water bottle at an officer. Again, I want to reiterate that we are not seeking to excuse Rubenacker's actions but rather intending to point out the differences in the acts and the resulting potential for punishment as despite these actions, all three individuals were given plea offers that have an offense level that is lower than the one that the Government is claiming applies to Rubenacker.

The Government has indicated that the reason for the different treatment is that they drew distinctions between individuals who entered the Capitol and those that did not when deciding to make plea offers at involved the dismissal of the 18 USC §1512(c)(2) count. But this explanation is simply not accurate as in the case of *United States v. Griswold,* 21-cr-459, the defendant was charged with 18 USC §1512(c)(2) after he forced his way inside the Capitol and made his way to the Senate Gallery. He then was later heard claiming, "We took the building. They couldn't stop us. And now

they know we can do it again and we will fucking do it . . . Pelosi, Schumer, all you mofos, back off, this is our country, we are willing to do whatever it takes to keep it..."  Nevertheless, the defendant was permitted to plead guilty to one count of Interfering with a Law Enforcement Officer During a Civil Disorder pursuant to 18 USC §231(a)(3). The agreed upon offense level is 13.

As such, it is clear that there is a disparity in the way that the Government is treating certain individuals and in particular, Mr. Rubenacker. We respectfully submit that this Court should take this fact into account when deciding on the sentence that Mr. Rubenacker is to receive.

## CONCLUSION

From the preceding, I sincerely hope that Your Honor has gotten a better sense for who the real Greg Rubenacker is. A good kid who realizes that he made a terrible mistake on January 6th, first in going to Washington and second for his actions inside the Capitol. An impressionable young man, Greg bought into the stories being told of a stolen election and all of the supposedly corrupt and illegal things that took place to alter the result. He now knows better.

As for  punishment, we submit that this Court should consider a "just punishment". Mr. Rubenacker, as acknowledged repeatedly throughout this submission, made a string of bad choices on January 6th after being caught up in the moment and in following the crowd, unique to this situation and fact pattern which will never re-occur.  Mr. Rubenacker has no criminal history and simply would not premeditatively violate the law.  This incident is simply out of character for him.

Although he knows better now, Mr. Rubenacker did not think his conduct through before acting. He never thought that he was committing a crime when he first entered the Capitol. If he had, he would never have taken selfies in the Rotunda afterwards and posted them online for the world to see. He quickly after leaving the Capitol realized the seriousness of what had just occurred and will have to live with the stigma of a felony conviction for the rest of his life.

Society recognition of every sentencing principle have all been served in this matter. Both specific and general deterrence have already been met by Mr. Rubenacker's arrest, his restriction to his residence for several months, the curfew placed upon him, the limitation upon his movements, and the permanent depravation of several constitutional and civil rights for all time.

Mr. Rubenacker's past history of being a law-abiding citizen, the fact that he is a productive member of society, even finding time to care for his elderly parents and his cooperation with law enforcement and the House Select Committee all testify to his rehabilitative potential.  This Court should vary downward by a substantial margin to ensure that Mr. Rubenacker is not unduly punished for this offense. What is being requested is that the court considers a sentence that both reflects the seriousness of the offense committed, promotes the respect for the law, but provides a just punishment to someone who lost his way for a little more than forty-five minutes, departing from the person that he truly is.  Indeed, a harsh sentence does nothing to deter one who is already deterred and frankly, fully rehabilitated.

We submit that this Court should also downwardly depart for Rubenacker's willingness to accept a plea early on. As mentioned, this will serve as an incentive to others who are still deciding whether to accept a plea to act sooner rather than later and thereby will help drastically reduce the number of outstanding cases from January 6th and, as a result, the cost to taxpayers that will be associated with taking all of those cases to trial.

While we agree that punishment may be warranted in this case, we respectfully submit that the punishment should be no more than is necessary to make sure that Mr. Rubenacker needs to understand his mistakes that day. I can assure you that he does.

As stated herein, it is the Defendant's position that the adjusted offense level in this matter should be 17. As such, the appropriate Guideline range is 24-30 months. We respectfully submit that a downward departure is warranted for all of the reasons stated and that a sentence of twelve months

is more than fair under the circumstances and accomplishes all of the previously mentioned goals. We further request that said twelve months be served as home confinement. We believe that such a sentence is in line with the sentences other individuals are facing despite the fact that their actions are more egregious than those of Rubenacker. Such a sentence would allow Mr. Rubenacker to pay his debt to society and thereafter continue on his career path before it is too late. We respectfully and humbly ask Your Honor to consider this sentence and its appropriateness and give Greg a chance to prove that what happened by his hand on January 6th was an aberration and will never happen again.

**WHEREFORE** the Defendant, Greg Rubenacker, prays this Court will grant the relief sought herein, and make a departure from and also grant a variance downward from the applicable Guidelines Range and sentence Mr. Rubenacker to twelve months of home confinement, a sentence that would allow Mr. Rubenacker to continue on his career path and to be a productive member of society.

DATED this 6th day of May, 20212

Respectfully submitted,

Michaelangelo Matera (MM1586)

The Matera Law Firm
*Attorneys for Greg Rubenacker*
560 Broadhollow Road, Suite 303
Melville, New York 11747
(516) 741-6700

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY, that a true and correct copy of the foregoing Sentencing Memorandum was filed with the Clerk of the Court and was sent via electronic mail to the United States Attorney Office at 1400 New York Avenue, Room 7113, Washington D.C. 20530, and ECM to the Assistant United States Attorneys, Mr. Troy Edwards and Ms. Laura Hill, on this 6th day of May, 2022.


Michaelangelo Matera (MM1586)

The Matera Law Firm
*Attorneys for Greg Rubenacker*
560 Broadhollow Road, Suite 303
Melville, New York 11747
(516) 741-6700

# EXHIBIT A

To The Honorable Chief Judge Howell

Hello, my name is Greg Rubenacker. I have had the pleasure of meeting you even though it is through a situation I wish did not happen and I regret my terrible decision making every day. As well as dealing with the consequences that I am already facing, I have been attacked physically and verbally because of my mistakes. I have lost my girlfriend of many years who I thought I was going to marry; I have lost numerous friends and it hurts me every day. I am sorry to the police officers who were hurt that day, I did not have intentions to hurt anyone and I do not believe that I did though I understand that I did make contact with them when I sprayed water from my bottle in their direction. Many people that day did have intentions to cause violence and even hurt others and it truly makes me sick that I am a part of a day where people did have plans to commit crimes and hurt people and that is not who I am.

I also want to extend my apologies to the entire Country. I am sorry that this day happened and that part of this Country looks at this day as one of the most horrific days in American history. I never went there to hurt anyone and I didn't go there to commit crimes. I went there because I believed the lies that were told by members of the media and our own political figures. Lies about a corrupt and stolen election. Lies that gave me a significant false understanding that by coming to Washington, we could do something about it. It is for this reason that I was upset and yelling at officers for not doing about the election. After all, our President told us that the election was stolen. He told us to "fight like hell" though physical fighting was not my intention. Why were these officers not doing as their Commander-in-Chief instructed? It caused me great confusion and I acted poorly to it.

I have been living with the consequences of my actions everyday and have been trying everyday to be a better person for myself and for this Country. I go to therapy every week and it has helped me tremendously. I have been on curfew for over 400 days as well as having an ankle monitor on for that period. I have had many sleepless nights and my doctor even said I'm developing sleep paralysis because the monitor grips too tight at times and the blood can't travel past. I have had a nightmare about the same thing for probably 3 months and I can't walk in my dreams because of that and I wake up with a numbing feeling on my leg. I have lost so many career opportunities not being in the city past 12 plus months. The hip hop community that I am involved in works at different hours than the normal 9-5 worker and before I was in trouble I

would spend time networking in the studio sometimes even sleeping in the studio. I have been working with Grammy nominated producers Buda and Grandz and Grammy nominated engineer Mike Kuz. They have helped me develop my own sound and have let me use their studio on Broadway to work and network. I also work with Craig Derry who is known for being lady Gaga and Katy Perry's vocal coach. I have been working at this since I was 14, and through their encouragement I know I have something to offer this Country through my music and I can help and heal people as I always have dreamed of. I have been working extremely hard on my passion and dreams for years and in 2020 I went to Timberlands studio and had plans to work with Chance the Rapper in Los Angeles but covid hit.

My parents are very old and I do my best to care for them and help them. My mom still has problems from her heart attack and also has PTSD so I try to help her when she has moments because I know what it feels like. My dad is turning 87 this year and I have been running errands for him as he is getting really tired and can't do all the things he wants or used to. I'm very worried about my father to be honest because I have never seen him this way in my whole life. On top of all of this I lost my best friends at 18 in a car accident and saw my best friend take his last breath. I saw my friend with a broken neck and it scares me…a year later my friend overdosed and 6 friends dying in a year really took a toll on my life and my state of mind.

I take full responsibility for my actions on January 6th and if I had it to do all over again, I would not have even gone to Washington that day. But again, I went with the belief that I was protesting an issue that deeply concerned me for the Country, an issue that I now understand was fabricated. I hope you can consider giving me a second chance so that I can prove to you and this Country that not everyone there that day is a bad person and that I am a loving human being. People make mistakes and I certainly made some on January 6th. But that shouldn't define them or me. I'm truly sorry for making my mistakes and for going on January 6th. It is not a day to be celebrated and I can assure you that nothing like that will ever happen with me again.

Very truly yours,

*Greg Rubenacker*

Greg Rubenacker

TO:  The Honorable Judge Howell:

From: Marguerite Rubenacker

10/12/21

 How does a mother plea for leniency for her son when she knows his actions were not the best choice.  I can only try.

My son Greg joined our family when he was  about 3  months old.  We loved him instantly.  Growing up in a family with 14 brothers and sisters has its challenges however Greg's compassion for life, family and friends has always shined through.

You are probably aware that several years ago, my son witnessed a horrific car accident that took the lives of his five closest friends.  His life forever changed and I can see the struggle that weighs heavy on my son's heart because of this.

Greg spends his days on his music and will help his father and I around the house. Greg is passionate about our welfare.  This is forever needed as our ages are 80 and 86 and my eyesight is limited.

In regards to January 6th, Greg has learned there are consequences for his actions and regrets  every moment.   My son has obeyed his curfew hours,  continues to wear the ankle monitor and attends court mandated therapy every week.    I am asking for leniency with your decision towards my son as this too weighs heavy on my heart.

Thank you for your time

Marguerite Rubenacker

107 Greenway Drive

Farmingdale, NY 11735

To the Honorable Beryl A. Judge Howell,

     I am submitting this character statement on behalf of Gregory Rubenacker. I am one of his brothers and will provide some insight of the type of character Greg is. First I will inform you a little of myself. I am a Master Sergeant in the United States Marine Corps and have been serving this grateful nation for 21 years. I am married with three children and currently living in Hawaii on military orders.

     Greg Rubenacker is a good hearted individual that is working toward a career of music production. He spends most of his time in doing so and has been working with other music industry coaches, producers and artist. Like any other American, he is reaching for his stars and doing what he can. For the incident during the capital, I want to apologize for his involvement in it, and while he has his own mind with no approval from myself, I do not think that there was an intent of malice or to try an over throw the government or harm anyone either. He has recently been following politics prior to the event and was trying to express some of his rights given by the constitution. As any young adults with little experience in the world, he found himself in a group that made him feel like he was in the right place at the right time, not fully understanding that everything would unfold the way it did, but that does not excuse the actions of what he did. He is being viewed as a threat to national security I do not believe he is one. This is the first time he has put himself in a situation of this magnitude and I don't believe he realized how this would turn out. He doesn't have a criminal history and is usually the guy who is passive in nature. I hope you look at everything closely and make a decision that will not put a young adult into prison for actions that are being viewed as threatening when it is not actually that.

     Even after this incident during the January event, I still trusted him around my children. Everyone makes mistakes, his mistake happens to potentially be at a higher consequence and I believe that he has also learned a lot from this even without the final outcome of the courts. Just like anyone else, he has had some life altering events in his past, his was losing some of his best friends in a car accident in which he thought he should have been in the vehicle with them instead of seeing them from another car. For many years he secluded himself from most people and maintained contact with only a few people, me being one of them. Over the past 5 years, he has opened himself to become better, for himself as an individual and for his music production ambitions.

     I am requesting that you take a closer look at his involvement and give him the verdict that he truly deserves, if you positively think he is a threat to national security, and had intent to overthrow the government, then give him the punishment he deserves. I do appreciate you for taking the time to read this letter and will be available for questions if needed. Thank you.


Very Respectfully,

Peter J. Rubenacker

Master Sergeant

United States Marine Corps

516-519-9127

Kathryn M. Cremmins

119 Greenway Drive

Farmingdale, NY 11735

Dear Judge Howell:

   Let me introduce myself, my name is Kathryn Cremmins and I have known Greg Rubenacker practically his entire life.  I lived five houses away from Greg and his family in Farmingdale.  When Greg was young, he and his brothers would often come knocking on my door to play video games with my son almost every weekend.  And as the boys grew up, they would come over more often and I would sit in and play video games with them for hours.  From Mario Kart to Rock Band, we all had good, clean fun.

   After I got divorced, when I would go visit my son, I would occasionally run into Greg. Greg was so excited about his music and looking forward to having a career in the music industry.  Greg would ask me to listen to some of the music he produced and recorded and I was so excited for him. Greg finally found his passion!  Greg has one of the kindest, gentlest young souls I have ever known.  Greg is a loving individual and like a brother to all his friends. I consider Greg to be like a son to me, as I do to all my son's close friends.

   Greg is in no way an outlaw or disobedient or a revolutionary.  Greg is not associated with any group of any kind.  Greg did not know what the outcome of that day was going to be, no one did how could anyone have known.  There were no plans no agenda no objective.  Greg is an innocent young man who was curious, and in my opinion, most likely just "got caught up in the moment".  Similar to those who attended Woodstock.

   Greg is a clean cut, well behaved, hardworking young man who deserves a second chance. Greg is not, was not and will never be a rebel. Greg has a very bright future in the music industry and to take that ALL away from an inspiring young man now would be devastating for him.

   The individual who turned Greg in, obviously does not know him well enough to KNOW that Greg would never maliciously or deliberately hurt, plan to hurt or associate himself with any persons or people who would do harm to another living soul.  It's just that plain and simple.

   Greg has learned his lesson and has done everything in his power to prove this, not only to his government, but to his family, his friends and most importantly, himself.

   In this age of Covid, we have all spent way too many hours alone behind closed doors and to incarcerate this young, inspiring musician would be tragic.

   Please do not condemn Greg for his one-time lack of better judgment in this regard.  In the end, we are all just human and Greg deserves another chance, a new beginning, a fresh start on life.

Sincerely

*Kathryn M. Cremmins*

Kathryn M. Cremmins

**From:** **Gigi Yulo** gigirubenacker@gmail.com
**Subject:**
**Date:** September 28, 2021 at 4:03 PM
**To:** Rubixbeats@yahoo.com

Dear Judge Howell:

My name is Regina Yulo.  In writing this letter to mom behalf of my brother,  Greg Rubenacker.
Greg is  a  good person with a good heart.
Being  a single mom of 2 , he has always been there for me and my kids.
I don't believe Greg to be what he is a accused of.
The Greg I know is loving, and caring . Greg is a person who is passionate about his music.
I feel every one of us is entitled to their opinion.
Nobody is perfect. We all make mistakes.
Hopefully you will take this into  consideration.
Thank you
Sincerely
R. Yulo

**From:** **Shiah Maisel** shiahmaisel1@gmail.com
**Subject:** Greg
**Date:** September 23, 2021 at 2:01 PM
**To:** Rubixbeats@yahoo.com

Hey judge Howell ,
this is Shiah Maisel , I'm a singer songwriter and have known Greg for a few years, He has been working extremely hard towards music and is really close to his dreams…He helps out in his community and I don't think Greg is a bad person nor a terrorist…I have seen him try to build younger artist into bigger artist …he has always told me he wants to heal the world and help people and contribute to society and the unfortunate…plz consider giving Greg a second chance

Love Shiah Maisel

9/26/21


Honorable Judge Howell


My name is Carol Ruzgar and I am the oldest sibling to Greg Rubenacker.  Since there is a 32 year age gap between the two of us, our relationship was different than most as I had my own family when Greg arrived.  Yet, since day one, Greg was and is my brother and forever loved.


As I am sure you are aware, in 2014 Greg witnessed (5) of his closest friends succumb to their injuries as a result of a tragic car accident.  This loss has weighed heavy on Greg's heart, as would anyone.  I can only pray that the pain in his heart eases over time.


Approximately 2 years ago, the dynamics of the relationship between Greg and I changed for the better.  Seeing the pain in his heart and his desperate search for peace I invited him to attend church services with me.  I knew God was reaching out to him and was overjoyed the first time Greg attended church services with me.  Actually I am blessed every Sunday when Greg sits next to me, singing songs of worship and closing his eyes in prayer.   I know that Greg is forever changed because God is at work in him.


In regards to January 6th ……… we all make mistakes in life.  The only One that is perfect is God.  We can get caught up in the moment and never stop to think how our actions may affect ourselves or others.  Greg is aware his actions come with consequences and knows he was wrong.     I am hoping and praying that the court could show leniency to Greg possibly with probation and community services, etc. where he can serve the community in a positive way.


I thank you very much for your time and consideration.


Sincerely,

Carol Ruzgar

5 Sullivan Ave

Farmingdale, NY 11735

**William and Robin Fitzgerald**
**79 Woodcock Lane**
**Levittown, NY  11756**

December 11, 2021

Chief Judge Beryl A. Howell

Honorable Judge Howell:

It is with great respect and admiration that we write this letter in regard to our close friend, who is like family, Greg Rubenacker, who we have known now for over 10 years.

We have nothing but respect and love for Greg.  He is a regular attendee at our church and he loves the Lord.  He has spent a lot of time not only with us but with our family.  He has been to many family gatherings and he is like a son to us.

He is no threat whatsoever to our family, to our grown children, to our grandson, nor to society.  I know whenever we see him he talks about his music, which he just came out with a new single, and honestly, he is just a good man.  He always shows respect, and is welcome into our home and family always.

Thank you for taking the time to read this character letter.

I am a legal secretary and I know how busy Judges are and to take the time to hear from people who care about someone who is going through a trying time means so much.

Thank you again.

Best regards,

William and Robin Fitzgerald


ProHEALTH℠
Part of Optum®

October 8, 2021

Patient:       **Greg Rubenacker**
Date of Birth: **2/5/1996**
Date of Visit: **10/8/2021**

To Whom It May Concern:

Greg Rubenacker was seen in my office on 10/8/2021 at 9:30 am.  Greg has been my patient since January 2020 and he has not always been compliant with his medications or made the best choices for his health. Over the past 12 months, I have noticed significant improvement in his medication compliance and interest in improving his general health.

If you have any questions or concerns, please don't hesitate to call.


Sincerely,

Conan Tu, MD

Brandon J. Cremmins

119 Greenway Drive

Farmingdale, NY 11735


Dear Judge Howell:

   My name is Brandon Cremmins.  I have known Greg Rubenacker for most of my life.  I have spent countless hours with him and his brothers hanging out, playing games, growing up along side them.

   I have never known Greg as someone that would cause harm to others or be destructive in anyway. He would never associate with terrible people like the groups that were at the capital that day.  Greg made a bad decision on his own and now is being associated with the real villains who were actively rioting causing harm at the capital.  He is a good person that wants to chase his passions in life and would do anything for the people he holds dear.

   Since that day Greg has been doing everything he can to show that he has learned his lesson and should have a second chance.  Please allow him to have that opportunity.

Sincerely


Brandon J. Cremmins

EXHIBIT B

# First Light Psychological Services, P.L.L.C.

| | | |
|---|---|---|
| 1111 Broadhollow Rd | **800-403-4360** | 120-34 Queens Blvd |
| Suite 204 | Fax: 1-888-509-0905 | Suite 300 |
| Farmingdale, N.Y. 11735 | | Kew Gardens, N.Y.11415 |

April 26, 2022

Michael Matera
560 Broadhollow Road
Suite 303
Melville, NY 11747

Re:    Greg Rubenacker
       DOB: 02/05/1996

Dear Mr. Matera,

     Mr. Rubenacker started mental health treatment in March 2021. He participated in a psychiatric evaluation and it was recommended that he attend mental health sessions once a week to minimize and cope with symptoms of generalized anxiety disorder. Mr. Rubenacker's attendance has been consistent and he is actively engaged throughout his sessions. Treatment sessions primarily focus on addressing negative thoughts and feelings surrounding his pending legal issues, identifying and discussing cognitive distortions and their relationship with his thoughts, emotions, and behaviors, and exploring and utilizing positive problem-solving skills, and coping skills. Mr. Rubenacker has demonstrated positive progress in treatment. He continues to report medication compliance and is actively engaged in the therapeutic process.

Sincerely,

*Kayla J. Moffitt* MA, MHC

Kayla J. Moffitt, M.A. MHC-LP, CASAC-T